KOPPERS UNITED CO. v. SECURITIES & EXCHANGE COMMISSION.

KOPPERS CO. v. SAME.

EASTERN GAS & FUEL ASSOCIATES v. SAME.

Nos. 8404, 8403, 8481.

United States Court of Appeals for the District of Columbia.

Argued June 3, 1943.

Decided Oct. 11, 1943.

Mr. Carleton M. Crick, of Pittsburgh, Pa., with whom Messrs. James S. Eastham, of Boston, Mass., and Walter N. Tobriner, of Washington, D. C., were on the brief, for petitioners.

Mr. Homer Kripke, Assistant Solicitor, S.E.C., of Philadelphia, Pa., with whom Mr. John F. Davis, Solicitor, S.E.C., of Philadelphia, Pa., was on the brief, for respondent.

Before GRONER, Chief Justice, and EDGERTON and ARNOLD, Associate Justices.

EDGERTON, Associate Justice.

These are petitions under § 24(a) of the Public Utility Holding Company Act of 1935[1] to review an order of the Securities and Exchange Commission. Petitioners applied to the Commission for declarations of their status under §§ 2(a) (7) and 2(a) (8) of the Act.[2] Koppers United Company (Koppers United) asked the Commission to declare that Brooklyn Union Gas Company (Brooklyn) was not its subsidiary. Eastern Gas and Fuel Associates (Eastern) asked to be declared not a subsidiary of Koppers Company. Koppers Company (not Koppers United Company) asked to be declared not a holding company with reference to either Brooklyn or Eastern. The Commission held a consolidated hearing and on September 28, 1942, denied all the applications.

On November 25, 1942, Koppers United and Koppers Company filed petitions for review of the Commission's order in this court. On the same day Eastern filed a petition for review of the order in the Court of Appeals for the First Circuit. On February 3, 1943, the Commission filed a transcript of the record in this court and on March 2, 1943, the First Circuit entered an order transferring the petition of East-ern to this court. On March 16, 1943, we granted leave to Eastern to prosecute its petition for review in this court but reserved the question of our jurisdiction until the hearing on the merits. The parties agree, rightly we think, that we have jurisdiction. The three petitions were consolidated for hearing.

The Koppers system is engaged in the production and marketing of coal and its by-products. The system owns or has a substantial interest in mines, a railroad, coal-cars, a steamboat company, dock facilities, coke plants, tar plants, storage yards and delivery trucks. It also manufactures and erects coke plants, gas apparatus and gas manufacturing machinery. The top holding company of the Koppers pyramid is Koppers United. On one side of the pyramid, Koppers United owns the entire voting stock of Fuel Investment Associates, which owns 28.36 per cent of the voting stock of Eastern, which is itself a holding company and controls a number of operating gas utilities. On the other side of the pyramid, Koppers United owns the entire voting stock of Koppers Company which controls 23.87 per cent of the voting stock of Brooklyn, a public-utility gas company. There is one important connection between the two sides of the pyramid, viz., Koppers Company owns 14.59 per cent of the stock of Eastern. Other subsidiaries of the system, some of which are operating gas utilities, are not directly involved here.

Both briefs refer to unprinted parts of the transcript. Our rules require the parties to print such parts of the record as they desire the court to read.[3] Except in proceedings in forma pauperis, three judges cannot reasonably be asked to search out references in a single copy of a bulky manuscript.

The aim of the petitions to the Commission was to obtain declarations that the relation of holding company and subsidiary did not exist between Koppers Company and Eastern, and likewise did not exist between either of the Koppers corporations and Brooklyn. Since in each case "10 per centum or more of the outstanding voting securities * * * are * * * owned," it follows directly from the definitions in § 2 (a) (7) and § 2 (a) (8) of the Act that the relation does exist unless the Commission "declares" the contrary. When one

---

[1] 15 U.S.C.A. § 79x (a), 49 Stat. 834.

[2] 15 U.S.C.A. §§ 79b (a) (7), 79b (a) (8), 49 Stat. 806–808.

[3] General Rules 17(c) (10), 17(e) (6), 38(h).

company owns 10 per cent of the stock of another the Commission is nevertheless authorized by § 2 (a) (7) to declare that the owning company is not a "holding Company" if it finds that the company "(i) does not, either alone or pursuant to an arrangement or understanding with one or more other persons, directly or indirectly control a public-utility or holding company either through one or more intermediary persons or by any means or device whatsoever, (ii) is not an intermediary company through which such control is exercised, and (iii) does not, directly or indirectly, exercise (either alone or pursuant to an arrangement or understanding with one or more other persons) such a controlling influence over the management or policies of any public-utility or holding company as to make it necessary or appropriate in the public interest or for the protection of investors or consumers" that the applicant be subject to the Act. Section 2(a) (8), which deals with subsidiary companies, uses corresponding language; it substitutes "is not controlled * * * by" for "does not * * * control", and "are not subject to a controlling influence" for "does not * * * exercise * * * a controlling influence." The Commission was unable to make the statutory findings and therefore denied the petitions. Section 24(a) of the Act provides that on review by a court "the findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."

■ Although petitioners admit that Koppers United and Fuel Investment control Eastern, they deny that Koppers United exercises any of its control of Eastern through the medium of Koppers Company. But Koppers Company, like Fuel Investment, is a 100 per cent subsidiary of Koppers United, and Koppers Company holds half as much stock in Eastern (14.59 per cent) as Fuel Investment holds (28.36 per cent). It would be strange if Koppers United exercised all its control over Eastern through the Eastern stock which is held by Fuel Investment, and none of its control through the Eastern stock which is held by Koppers Company. The stated value of Koppers Company's holdings in Eastern is $25,000,000. The executive committee of Koppers United determines the major policies of the entire Koppers system, including Eastern. In its entire history Koppers Company has had only twenty-three directors. Twenty of these have been officers or directors of Koppers United. In view of these

facts the Commission inferred that there was only a paper separation between Koppers United and Koppers Company, and declined to find that Eastern was not subject to a controlling influence by Koppers Company, that Koppers Company did not exercise a controlling influence "directly or indirectly" over Eastern, or that Koppers Company was not an intermediary through which Koppers United exercised its control over Eastern. We think the Commission's conclusion that the statutory findings could not be made is supported by substantial evidence.

The relationship of Brooklyn to Koppers United and Koppers Company is more complicated. Brooklyn is a large gas utility company. The original aim of the Koppers system was an organization which would mine coal, transport it, process it, sell it, and deliver it to the ultimate consumer. The coke plants which constitute one of the links in this chain produce as a by-product a gas that can be sold to gas utility companies. Koppers coke plants in various parts of the country have supplied gas to such companies. This has brought the Koppers system into conflict with "a school of thought that gas companies should own their own producing units." American Light & Traction Company, which in 1927 controlled about 30 per cent of the voting stock of Brooklyn, held that theory. Brooklyn decided to erect a large coke-gas plant. There is evidence that this aroused in the Koppers system a fear of "ruinous competition" in the New York Harbor coke market. The Brooklyn directors agreed to sell their plant to Koppers Company. This provoked rancor in American Light & Traction. In order to settle the difficulty an arrangement was made by which, among other things, Koppers Company acquired the holdings of American in Brooklyn and transferred to American the Koppers interest in a Milwaukee coke plant. Koppers Company thus came to own some 34 per cent of Brooklyn stock. It had bought 20,000 shares, amounting to 3 or 4 per cent, in the open market. By reason of stock conversions, this has been reduced to 23.87 per cent. No other single block of Brooklyn stock exceeds 5 per cent.

The original plans for the Brooklyn plant called for the production of coke sufficient to meet the requirements of Brooklyn. After the arrangement with Koppers, the plant was so much enlarged that Brooklyn now has a surplus coke pro-

duction of about 350,000 tons per year, more than any other gas company in the country. Koppers commenced operating the plant for the account of Brooklyn, pending action by the New York Public Service Commission on the sale of the plant to Koppers. But in 1930 the Commission refused to sanction the sale. In consequence, as petitioners say in their brief, "Koppers found itself faced with competition in its Long Island coke business." Brooklyn, on the other hand, found itself with an "unbalanced" plant which it had no staff to run, and with no facilities for coping with Koppers in the Long Island coke market. Brooklyn did not accede to the desire of Koppers that Koppers continue to operate the plant. But Brooklyn took over, along with the plant, the Koppers staff which was operating it, and Brooklyn and Koppers have operated in harmony ever since. Brooklyn and Koppers have never had joint officers or made inter-company loans. But Brooklyn buys all its coal from Koppers. The Commission found that it pays only a fair price. It sells all its surplus coke to Koppers, and stores it at its own risk until Koppers is ready to take it away. At least two-thirds of the coke which Koppers sells in the New York area is supplied by Brooklyn. Koppers gauges its selling effort in the New York area to provide a market for Brooklyn's coke together with a margin of safety. The directors of Brooklyn have exerted only the most casual supervision over the prices involved in the inter-company sales. They have given no serious consideration to the possibility of finding coke markets other than Koppers, although other concerns have made unsolicited and unsuccessful attempts to buy Brooklyn's coke. Koppers sends its proxies to the Brooklyn management and never votes them against the wishes of the management.

Only one of Brooklyn's board of nine directors, who was appointed in 1939 as a Koppers representative, has ever had any direct connection with either Koppers company. But there is an indirect connection between the Koppers companies and the Brooklyn board of directors. The Henry H. Rogers group at one time controlled a considerable block of voting stock of Brooklyn. How much of this is still retained does not appear. But it appears that when the record closed four of Brooklyn's nine directors were Rogers (Coe) representatives. There are harmonious relations between the Rogers group and the Koppers group. These same four Rogers directors of Brooklyn are also directors of the Virginian Railway Company. Koppers Company owns one third, and Eastern another third, of the stock of The Virginian Corporation, which holds 40 per cent of the voting stock of the Virginian Railway Company. The Rogers interests hold about 34 per cent of the Virginian Railway Company, but, through control of proxies, could probably outvote the Koppers interests. However that may be, the two groups have co-operated. Coal is extracted by a Koppers operating subsidiary from a mine owned by a Virginian Railway subsidiary. It is carried by Virginian to the Atlantic coast, loaded upon ships owned by Koppers, and then transported to Brooklyn's plant, which processes it and stores the surplus coke for Koppers until Koppers is ready to take it.

■ We have made no attempt to summarize either all the evidence which supports the Commission's findings or all the evidence which supports the contentions of the petitioners. We think it appears that the Commission's findings are supported by substantial evidence. Petitioners interpret the arrangements between Koppers and Brooklyn as simply a business deal which grew out of the economic situation; Koppers needed Brooklyn, Brooklyn needed Koppers, and they arrived at an agreement by bargaining at arms' length. We think the evidence did not require the Commission to find that Brooklyn was not controlled by, or subject to the controlling influence of, Koppers Company and Koppers United. "Investing the Commission with the duty of ascertaining 'control' of one company by another, Congress did not imply artificial tests of control. This is an issue of fact to be determined by the special circumstances of each case." [4] The theory of the Act is that ownership of more than ten per cent of a corporation's stock is enough to show control or a controlling influence, unless in a particular case other facts rebut the inference. The other facts which we have stated furnish independent support for an inference that Brooklyn's management will probably defer to the

---

Rochester Tel. Corp. v. United States, 307 U.S. 125, 145, 59 S.Ct. 754, 764, 83 L.Ed. 1147. The Commission there involved was the Federal Communications Commission.

wishes of Koppers in matters of importance. This is quite enough to constitute a controlling influence, if not control. We have held that a controlling influence is "something less in the form of influence over the management or policies of a company than 'control,'" and that a latent power of control may amount to a controlling influence.[5] Although petitioners' evidence tended to show that Brooklyn does not invariably act in accordance with the wishes of Koppers, the most that could be said in petitioners' favor would be that two equally probable, but inconsistent, inferences could be drawn from the entire evidence. In such circumstances a finding against the party upon whom rests the necessity of sustaining one of these inferences is clearly correct.[6] It devolved upon petitioners, under the statute, to sustain the inference that both control and controlling influence were absent. Petitioners emphasize the word "exercise" in § 2(a) (7). But §§ 2 (a) (7) and 2(a) (8) are intended to be read together, and we think Congress meant no more by "exercise * * * a controlling influence" in § 2 (a) (7) than it meant by "subject to a controlling influence" in § 2 (a) (8).

The evidence did not require the Commission to find, in respect to any of the corporate relationships involved in this case, that it was not necessary or appropriate in the public interest or for the protection of investors or consumers that the petitioners be subject to the obligations of the Act.

While these cases were awaiting a hearing in this court, the petitioners moved[7] to be allowed to adduce as evidence the fact that after the close of the hearings before the Commission, Brooklyn ceased to utilize and to pay Koppers Company for the supervisory and consultative services of Dan M. Rugg. For reasons stated in our opinion in Central and South West Utilities Co. v. Securities and Exchange Commission, — U.S.App.D.C. —, 136 F.2d 273, the motion is denied.

Affirmed.

---

[5] American Gas & Electric Co. v. Securities & Exchange Commission, 77 U.S. App.D.C. 174, 134 F.2d 633, 641-2, cert. denied, 63 S.Ct. 1318, 87 L.Ed. —. Cf. F. H. M. Byllesby & Co., 6 S.E.C. 639, 651; Detroit Edison Co. v. Securities & Exchange Commission, 6 Cir., 119 F.2d 730, 738, certiorari denied 314 U.S. 618, 62 S. Ct. 105, 86 L.Ed. 497; Public Service Corp. of New Jersey v. Securities & Exchange Commission, 3 Cir., 129 F.2d 899, 903, certiorari denied 317 U.S. 691, 63 S.Ct. 266, 87 L.Ed. —.

[6] Pennsylvania R. Co. v. Chamberlain, Adm'x, 288 U.S. 333, 339, 53 S.Ct. 391, 77 L.Ed. 819.

[7] Under § 24(a) of the Act, 15 U.S.C.A. § 79x(a).