PENNALUNA & COMPANY, Inc., Benjamin A. Harrison, and Harry F. Magnuson, Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 22143.

United States Court of Appeals
Ninth Circuit.

April 10, 1969.
Rehearing Denied July 11, 1969.

Saxon, Maguire & Tucker, Washington, D. C., Paine, Lowe, Coffin, Herman & O'Kelly, Spokane, Wash., LeSourd & Patten, Seattle, Wash., Lowenstein, Pitcher, Hotchkiss & Parr, New York City, L. R. Small (argued), of Paine, Lowe, Coffin, Herman & O'Kelly, Spokane, Wash., for petitioners.

Walter P. North (argued), Associate Gen. Counsel, Philip A. Loomis, Jr., Gen. Counsel, Jacob H. Stillman, Asst. Gen. Counsel, Theodore S. Kaplan, Harvey A. Rowen, Attys., Washington, D. C., James E. Newton, Regional Adm., SEC, Seattle, Wash., for respondent.

Before CHAMBERS and MERRILL, Circuit Judges, and CROCKER, District Judge *.

MERRILL, Circuit Judge:

Pursuant to § 25 of the Securities Exchange Act of 1934, 15 U.S.C. § 78y(a), petitioners seek review of an order of the Securities and Exchange Commission.

Pennaluna & Company was a corporation operating in Wallace and Kellogg, Idaho, and Spokane, Washington, as a registered broker-dealer in securities. It dealt primarily in securities issued by mining companies and for the most part traded on a wholesale basis with other broker-dealers. The company was owned by the two individual petitioners. Harrison owed 62½ per cent of the stock and served as president, operated the Spokane office, and was in charge of the company's trading activities. Magnuson owned 37½ per cent of the company, served as treasurer, managed the Wallace and Kellogg offices, and was in charge of the company records. He also operated a separate accounting business in Wallace. The company was incorporated in 1963. Prior to that time, throughout the period here involved, it existed as a partnership, with the interests of Harrison and Magnuson the same as their subsequent stock interests.

The Commission found violations of the Securities Act of 1933 and Securities Exchange Act of 1934 (together with certain Commission Rules) on the part of all petitioners. By its order it revoked the registration of Pennaluna as a broker-dealer, barred Harrison and Magnuson from being associated with any broker-dealer, and expelled Harrison from membership in the Spokane Stock Exchange. §§ 15(b) and 19(a) (3) of the Exchange Act, 15 U.S.C. §§ 78o(b) and 78s(a) (3).

Petitioners admit certain charged violations, dealing mainly with record-keeping. At issue in these proceedings are alleged violations of registration and antifraud provisions.

The charged violations arose out of three courses of events coinciding in point of time: 1. The acquisition by Pennaluna and Magnuson of shares in Silver Buckle Mining Co. (which were later resold to the public). These events relate particularly to the registration violations and will be discussed in that connection. 2. The acquisition by Silver Buckle of a controlling interest in West Coast Engineering Co. (resulting in its ultimate merger into West Coast) and West Coast's ultimate financial failure. 3. Pennaluna's trading activity in

---

* Honorable M. D. Crocker, United States District Judge for the Eastern District of California, sitting by designation.

Silver Buckle shares during a spectacular bull market in those shares. The last two courses of events relate particularly to the antifraud violations and will be discussed in that part of this opinion.

## I. VIOLATIONS OF REGISTRATION PROVISIONS.

This case does not involve a primary distribution by the issuing company. Rather, we are here dealing with alleged secondary distributions of stock by a controlling person through various underwriters, with none of the transactions registered as required by § 5 of the Securities Act of 1933.[1]

### A. *Violations by Pennaluna.*

With respect to the violations charged against Pennaluna the dispute centers in major part around two large blocks of unregistered Silver Buckle shares. On May 8, 1962, Oil, Inc., disposed of 600,-555 shares. On September 29, 1962, a block consisting of 1,167,111 shares held by two corporations—New Park Mining Co. and East Utah Mining Co.—was disposed of.

Pennaluna is charged with being an underwriter as to shares acquired (and resold) by it from these blocks.

By the basic definition in § 2(11), one "who [purchases] from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security" is an underwriter. There is no question that Pennaluna purchased with a view to a resale to the public and thereafter sold to the public. The question is whether in so acting it dealt with an issuer. It did not purchase from or sell for Silver Buckle, the actual issuer. It is necessary, therefore, to determine whether Pennaluna purchased from or sold for a person included in the term "issuer" for the purpose of § 2(11): "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."[2]

The Commission found that at the time of the sales in question Magnuson

---

1. § 5(a), 15 U.S.C. § 77e(a), reads as follows:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

§ 4, 15 U.S.C. § 77d:

"The provisions of section 77e of this title shall not apply to any of the following transactions:

(1) Transactions by any person other than an issuer, underwriter, or dealer * * *."

§ 2(11), 15 U.S.C. § 77b(11), provides in part:

"The term 'underwriter' means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security * * *. As used in this paragraph the term 'issuer' shall include, in addition to an issuer, any person di-

rectly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."

If any person buys from a controlling person with a view to redistribution or sells for a controlling person in connection with a distribution, this becomes a transaction by an underwriter which requires registration. The controlling person, *though not the underwriter or an issuer*, participates in a "transaction by an * * * underwriter" and in so doing violates § 5 if registration *is not first* effected. SEC v. Culpepper, 270 F.2d 241, 246–247 (2d Cir. 1959); SEC v. Chinese Consolidated Benevolent Ass'n., Inc., 120 F.2d 738, 741 (2d Cir.), cert. denied, Chinese Consol. Benev. Ass'n v. SEC, 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497 (1941); 1 L.Loss, Securities Regulations, 644 (2d ed. 1961).

2. Rule 405 provides:

"The term 'control' (including the terms 'controlling', 'controlled by' and 'under common control with') means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise."

was a person controlling Silver Buckle and was therefore an "issuer" as that term is used in § 2(11); that as to the stock in question he effected public distributions through Pennaluna; and that Pennaluna acted as underwriter in effecting these transactions. The petitioners dispute these contentions.

### 1. *Burden of Proof.*

At the outset, petitioners contend that the Commission erroneously imposed upon them the burden of establishing a lack of control by Magnuson.

It is well recognized as a general proposition that one who claims an exemption from the broad registration requirement of § 5 has the burden of proving that the exemption applies. SEC v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); SEC v. Sunbeam Gold Mines Co., 95 F.2d 699 (9th Cir. 1938).

Petitioners do not dispute this as a general proposition. They would, however, limit it to a primary distribution where the shares come from the issuing company. They concede that in such a case the distribution carries a presumptive need for registration. Where the shares do not come from the issuing company, however, petitioners contend that there is no presumptive need and that the Commission should bear the burden of establishing that the shares came from a controlling person and thus of establishing the existence of an "issuer" under § 2(11).

The holding of SEC v. Culpepper, 270 F.2d 241 (2d Cir. 1959), is to the contrary and we agree with that holding. See also SEC v. Franklin Atlas Corp., 154 F.Supp. 395 (S.D.N.Y. 1957). Petitioners' result would place upon the Commission the burden of proving the need for registration in all secondary distributions. The congressional concern over such distributions, made clear from legislative history,[3] strongly indicates that the presumptive need for registration implicit in § 5 extends to all secondary distributions not insignificant in their proportions:

While the congressional concern reached to all secondary distributions of significant proportions it was obvious that it could not impose upon a seller other than the issuing corporation the duty of registering his stock unless the shareholder was in a position to require the issuing corporation to seek registration. "Control" of the corporation thus became an essential factor in cases of secondary distribution.

In the light of this purpose a practical test for control has been suggested: "Is a particular person in a position to obtain the required signatures of the issuer and its officers and directors on a registration statement?" 1 L.Loss, Securities Regulations 557 (2d ed. 1961).

Where a secondary distribution of significant proportions is involved it is not unreasonable, in our judgment, to impose upon the seller the burden of establishing his inability to secure the necessary corporate action.

### 2. *Magnuson's Control of Silver Buckle.*

Silver Buckle was organized in 1947 with F. Scott, its organizer, serving as president and director throughout its corporate existence. Initially it had 7½ million shares outstanding, and issued 2 million more in mid-May to effect a share exchange with West Coast Engineering Co. Prior to the May 8, 1962, sale by

---

3. H.R.Rep.No. 85, 73d Cong., 1st Sess., 13–14 (1933):

"Its [§ 2(11)] second function is to bring within the provisions of the bill redistribution whether of outstanding issues or issues sold subsequently to the enactment of the bill. All the outstanding stock of a particular corporation may be owned by one individual or a select group of individuals. At some future date they may wish to dispose of their holdings and to make an offer of this stock to the public. Such a public offering may possess all the dangers attendant upon a new offering of securities. Wherever such a redistribution reaches significant proportions, the distributor is treated as equivalent to the original issuer and, if he seeks to dispose of the issue through a public offering, he becomes subject to the act."

Oil, Inc., Magnuson was the holder of 542 shares. He was not an officer or director. The SEC has found him to be a controlling person on that date and that his control continued throughout the life of Silver Buckle. Although conceding that he later occupied a position of control, petitioners strenuously assert that he was not in such a position in May 1962, or in September 1962, when the stock held by New Park and East Utah was sold.

 "Control" is not to be determined by artificial tests, but is an issue to be determined from the particular circumstances of the case. Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939). Under Rule 405 (footnote 2, *supra*), it is not necessary that one be an officer, director, manager, or even shareholder to be a controlling person. Further, control may exist although not continuously and actively exercised. 2 L.Loss, Securities Regulations 776–81 (2d ed. 1961). See SEC v. Culpepper, *supra*; Koppers United Co. v. SEC, 78 U.S.App.D.C. 151, 138 F.2d 577 (1943); SEC v. Franklin Atlas Corp., *supra*.

██ By January 1963, Magnuson was unquestionably in a position of control of Silver Buckle through stock acquisition of his own and that of Golconda Mining Co., a company under his control. The Commission scrutinized his prior relations with those individuals who clearly constituted the Silver Buckle control group. It concluded that his connection with two important subsidiary corporations, the group's reliance upon his assistance, their close relationship in enterprises other than Silver Buckle and the freedom with which the group felt able to call upon him for assistance in their efforts to retain control supported the conclusion that he was a member of the Silver Buckle control group during the period from May, 1962, on. We cannot say that this conclusion was without sufficient foundation.[4] The fact that Magnuson, in taking control of the stock sales (see *infra*), was accommodating the control group, strongly suggests his ability to insist upon registration.

### 3. Whether Pennaluna Purchased From or Sold For Magnuson.

Oil, Inc., New Park, and East Utah disposed of their shares through the device of contracts of sale with escrows. By the contracts, the sales were to Magnuson with the shares placed in escrow to be released to Magnuson as the purchase price was deposited.

The Commission has found that the purpose of this arrangement was to assure the Silver Buckle control group that the shares would be acquired by "friendly hands" or that the disposition would be "to new owners who would not pose the threat to the market indicated by Steen." (See footnote 4, *supra*.) Under his authority and control over the escrow, Magnuson could keep all the shares for himself or dispose of them in his uncontrolled discretion to such purchasers as he approved. Shares could

4. Prior to May 1962, Magnuson, and Scott (Silver Buckle's president), were directors of Vindicator Mining Co., of which Silver Buckle was a one-half owner. Magnuson also was a shareholder and director of Ruby Silver Mines, a Silver Buckle subsidiary. Those unquestionably in control of Silver Buckle included Scott, Gay, Hull and Cranmer. Scott and Gay had securities accounts with Pennaluna. Hull, who acted as attorney for Silver Buckle, was Magnuson's personal attorney and attorney for Pennaluna. Cranmer, for some time prior to May 1962, had controlled Oil, Inc., New Park and East Utah, whose combined holdings in Silver Buckle amounted to around 2,000,000 shares. In 1962 he was engaged in a struggle with Charles Steen for control of those corporations. Steen subsequently acquired control of New Park and East Utah, but Cranmer retained control of Oil, Inc. Steen was highly critical of Silver Buckle management and threatened to take over control of Silver Buckle. When these three companies disposed of their Silver Buckle holdings the Silver Buckle control group was fearful that the shares might fall into unfriendly hands. Scott secured Magnuson's assistance in placing the shares. The September sales of New Park and East Utah shares were pursuant to a plan worked out by Magnuson, Scott and Hull.

reach public distribution only to the extent that he allowed. As to the New Park and East Utah shares, the contracts of sale granted him voting rights during the escrow period.

Of the Oil, Inc., shares Magnuson retained 172,000 for himself and his children; 100,000 went to corporations of which Magnuson was a shareholder, officer or director; 90,555 were taken by Pennaluna. In January, 1963, 20,000 shares taken by Golconda Mining Company were sold to Pennaluna by Magnuson.

Of the New Park and East Utah shares Magnuson retained 370,000, and 200,000 were taken by Pennaluna. Of the 200,000 Pennaluna shares, 100,000 were sold over the counter. The other 100,000 were first transferred to the personal accounts of Harrison and Magnuson from which they were later retransferred to Pennaluna through a nominee account in the name of one O'Brien. The Commission concluded:

> "Magnuson as a member of a control group in Silver Buckle, if not himself actually in control, caused accounts over which he had discretionary authority or otherwise controlled and the facilities of Pennaluna to be employed to buy and resell to the public large amounts of Silver Buckle stock. Pennaluna thus sold for or on behalf of a controlling person of the issuer, or, in the case of the O'Brien transactions, purchased from an 'issuer' with a view to distribution, and therefore became an 'underwriter' within the meaning of Section 2(11) of the Securities Act."

We have no difficulty with the 100,000 shares reacquired by Pennaluna from Magnuson through the "O'Brien transaction," nor with those acquired by Golconda Mining Company and later sold to Pennaluna. The conclusion of the Commission that Pennaluna purchased them from an issuer follows from the fact of Magnuson's control.

We do have trouble with the Commission's conclusion that the shares taken by Pennaluna from the escrows were sold "for or on behalf of" Magnuson.

Before the Commission, the staff (Division of Trading and Markets) contention was that all shares acquired from escrow by Pennaluna were purchased from Magnuson rather than directly from the owning companies. While this contention was not expressly rejected, it was not the basis on which the Commission rested its determination and, quite candidly, we cannot understand the basis on which it did act. The shares Pennaluna purchased may well have been acquired at the behest of Magnuson, but when they were sold they were Pennaluna's shares and were sold on its own behalf and not "for or on behalf of" Magnuson. Magnuson's common control of Pennaluna and Silver Buckle, might, under § 2(11), constitute Pennaluna an issuer for some other underwriter, but can hardly constitute it underwriter for itself.

We therefore find ourselves unable to accept the Commission conclusion and must accordingly disapprove the Commission order respecting this aspect of Pennaluna's liability. (This disapproval necessarily carries with it rejection of the Commission's order respecting violations by Magnuson and Harrison, next discussed, in so far as the order is based upon shares taken by Pennaluna from escrow.) A remand thus becomes necessary in order that the Commission may re-examine the penalties imposed. On remand the Commission may wish to clarify its position in this respect.

B. *Violations by Magnuson.*

Magnuson is not, of course, charged as a § 2(4) issuer, but with participating in violations by underwriters. See footnote 1, supra. As to the shares taken by Pennaluna from escrow, the determination of Magnuson's violation is subject to the same infirmity as that respecting Pennaluna.

As we have noted, Magnuson acquired in his own name substantial blocks of the Oil, Inc., stock in May, 1962, and of

the stock sold by New Park and East Utah in September, 1962.

From July, 1962, to July, 1963, he sold to the public 238,000 shares of Silver Buckle through brokers and dealers other than Pennaluna. Since we uphold the Commission's finding that he was in a position of control during this period, he participated with underwriters as to all of these distributions.

In May and June, 1963, he sold shares to Pennaluna through the nominee O'Brien, which Pennaluna resold to the public. As to this stock, Pennaluna stood in the position of underwriter and Magnuson, as issuer, participated.

Magnuson further sold shares of West Coast Engineering Company (of which company more will be said later in this opinion). At the times of these sales Magnuson was unquestionably in a position of control of West Coast. Some of these shares were sold to Pennaluna and of these shares 750 were sold to the public. The shares not sold to Pennaluna were sold to the public through other brokers and dealers. As to all of these shares Magnuson participated with an underwriter. As to the 750 shares sold by Pennaluna to the public, Pennaluna occupied the position of underwriter.

As to all of these transactions the Commission's findings are fully supported.

■ Magnuson urges that there is no substantial support for the Commission's findings that these violations were wilful. He relies upon a letter under date of October 5, 1962, from Hull, Magnuson's attorney, advising that Magnuson was not in a position of control.

We do not regard the letter as sufficient to warrant rejection of the Commission's finding of wilfulness on the part of Magnuson. The attorney who wrote the letter was a close personal friend of long standing who was also involved with the control group of Silver Buckle. Relevant facts are not discussed in the letter (e. g., Magnuson's connection with Silver Buckle subsidiaries; the reliance of the control group on Magnuson in placing shares in friendly hands). This, at least, should have suggested to Magnuson that the letter's analysis was unreliably superficial. More importantly, Magnuson's control position altered materially in the days following October 5, 1962, rendering the letter substantially outdated, yet Magnuson's sales of shares continued.

We conclude that as to Magnuson's violations of § 5 the Commission order, save as already noted, is entitled to enforcement.

## C. Violations by Harrison.

Harrison also was charged with participating with Pennaluna in its violations. Again, as the scope of Pennaluna's violation is reduced, so is the scope of Harrison's.

The Commission found:

"Harrison, who, as the firm's trader, effected the sales to broker-dealers and to retail customers for Pennaluna, was aware of facts which put him on notice that distributions of control stock might be involved. He knew that Magnuson had twice purchased large blocks of Silver Buckle stock for Pennaluna and that in January 1963 our staff had raised questions regarding the legality of sales of the stock emanating from New Park and East Utah. At least by April 1963, he was aware of the fact that Magnuson was taking an active part in West Coast's affairs, and by the time Pennaluna purchased the West Coast shares from Magnuson, Harrison knew that Magnuson was a director of West Coast."

■ This finding is supported by the record. As to Harrison the Commission order, save as already noted, is entitled to enforcement.

## II. ANTIFRAUD VIOLATIONS.

West Coast Engineering Company, incorporated in the State of Washington in 1960, was engaged in the development and leasing of automated archery lanes. It leased its first set of lanes in Sep-

tember, 1961, and promptly found itself in financial difficulties. In October, 1961, its president sought financial assistance from Magnuson, Scott and other Silver Buckle associates, and the following month a loan was secured from Silver Buckle in consideration of which Silver Buckle acquired the right to secure stock control. By January, 1962, Silver Buckle held 54 per cent ownership and controlled West Coast. Silver Buckle associates dominated the board and management of West Coast.

Throughout 1962 West Coast opened more lanes but never found relief from financial pressure. Its deficit increased and it was forced to sell its interest in one lane. In December 1962, Magnuson obtained for West Coast a guarantee of their financial obligations by Golconda Mining Company in exchange for a stock option, with West Coast pledging as security 2,000,000 shares of Silver Buckle it had received as a result of a stock exchange in May 1962.

In January 1963, West Coast sold its interests in its remaining lanes. In April 1963, Silver Buckle was merged into West Coast. Losses continued throughout the year and the archery business finally was discontinued.

Coinciding incongruously with this unhappy financial history was a bull market in over-the-counter sales of Silver Buckle shares. Commencing in October, 1962, immediately following Pennaluna's acquisition of 200,000 shares from the New Park and East Utah escrows at 20 cents a share, the price of shares rose steadily to a high of $1.40 on January 8, 1963.

The Commission found that while prior to October 1962, Pennaluna's trading in Silver Buckle had been modest, after its New Park and East Utah acquisitions "the firm's trading volume in Silver Buckle stock took a dramatic upsurge and the quotations showed a steady increase in which Pennaluna was the consistent leader." It specified: "During this period [from October 1, 1962, to January 8, 1964,] Pennaluna submitted quotations on all but two trading days. Out of 56 days on which Pennaluna and at least one other firm submitted bids, Pennaluna was the high bidder on 34, and on 13 days its bid was equal to the high. On 7 additional days, Pennaluna was the only bidder. Although there was a substantial number of dealers in various parts of the country who made a market in Silver Buckle stock, the record shows that at least for the period from October 1, through December 4, 1962, Pennaluna did by far the greatest volume of trading in such stock."

The charges against petitioners were that beginning about September 29, 1962, Harrison and Magnuson caused Pennaluna to engage in manipulative activities with respect to Silver Buckle stock designed to raise the price of such stock artificially and to induce other broker-dealers to bid for such stock.

Harrison and Magnuson were also charged with making and causing Pennaluna to make false and misleading statements and omissions of material facts. Misrepresentations and predictions were made by Harrison as Pennaluna's trader in a series of teletype conversations with other broker-dealers specified by the Commission in its opinion. Glowing reports of West Coast were issued with knowledge that they were made in absence of supporting financial statements. To suggest a scarcity of supply, brokers were falsely advised that the shares sold by New Park and East Utah (a substantial volume being in Pennaluna's hands) were off the market.

Magnuson was found to have participated in these activities and to have had and violated a duty to keep himself informed and provide appropriate restraints. Further, from August to December, 1963, while Magnuson was acting as a director of West Coast, he sold large amounts of West Coast stock to Pennaluna and others without disclosing its adverse financial condition. As an insider he was under a clear duty to

disclose material information. Cady, Roberts & Co., 40 S.E.C. 907 (1961); see Gratz v. Claughton, 187 F.2d 46 (2d Cir.), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951); 3 L.Loss, Securities Regulations 1454–56 (2d ed. 1961). He had himself been instrumental in securing publication of material picturing West Coast as in a favorable financial condition, with knowledge that the situation in truth was quite the contrary.

■ The Commission concluded that: "Pennaluna, together with or aided and abetted by Harrison and Magnuson, wilfully violated the anti-fraud provisions of Section 17(a) of the Securities Act and Sections 10(b) and 15(c) (1) of the [Securities] Exchange Act and Rule 17 CFR 240.10b–5, and 15c1–2 thereunder."

The record amply supports these conclusions.

On this review petitioners advance again certain factual contentions they had made to the Commission: that the market rise was not due to manipulation but to publicity attending the opening of each new West Coast archery lane; that Harrison's representations were made in good faith and constituted mere shop talk; that Magnuson was honestly optimistic about West Coast's future. The Commission upon the record was wholly justified in rejecting these contentions.

Petitioners also question the Commission's standard of proof, contending that it must be "clear and convincing" rather than a simple preponderance of the evidence. The Commission did not specify the standard it was using and we do not find that petitioners' contention in this respect was made to the Commission. We presume regularity and find no issue of law presented. Even under the stricter standard the Commission's findings are supported by the record.

The Commission order in these respects is entitled to enforcement.

## III. BIDS AND PURCHASES OF STOCK DURING DISTRIBUTION.

■ Rule 10b–6 (17 CFR 240.10b–6), under the Securities Exchange Act, prohibits an underwriter or other participant in a distribution from bidding for or purchasing securities being distributed or other securities of the same class and series unless he has completed his part in the distribution. The Commission has found all petitioners to have violated this rule.

Subject to the same limitations as were found to exist in discussing the registration violations, the Commission's order is entitled to enforcement.

## IV. CONDUCT OF THE SEC STAFF.

■ Petitioners make various allegations of unfairness on the part of the SEC staff. Chief among them is the assertion that the staff misled them into entering into stipulations of fact (a 400-page stipulation) by telling them that the staff would only seek suspension. The contentions appear to be afterthought and were not made to the Commission until long after expiration of the time for rehearing provided by Commission rules. See § 25 of the Exchange Act, 15 U.S.C. § 78y(a). We also regard them as lacking in specificity and in showing of prejudice. We find in them no basis for upsetting the Commission proceedings.

## V. PENALTIES.

Petitioners simply feel that they have been too severely dealt with. We find no basis for interfering with the Commission's determination as to what is best in the public interest under these facts.

## DECISION.

The Commission is reversed upon its determination that Pennaluna acted as underwriter as to the shares it secured directly from the Oil, Inc., New Park, and East Utah escrows and that the pe-

titioners, in disposing of these unregistered securities and in bidding for and purchasing other Silver Buckle shares during the course of their disposition, violated § 5 of the Securities Act and Commission Rule 10b–6 under the Securities Exchange Act.

In all other respects the Commission is affirmed in its determination of violations.

The matter is remanded to the Commission for re-examination of penalties in the light of our ruling and, should it so desire, for clarification of its opinion with respect to the determination upon which we reverse.