**Randolph PHILLIPS, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 19, Docket 30665.**

United States Court of Appeals
Second Circuit.

Argued Nov. 16, 1967.

Decided Jan. 16, 1968.

Randolph Phillips, New York City, pro se.

J. Asa Rountree, New York City, (Debevoise, Plimpton, Lyons & Gates, New York City, Samuel E. Gates, New York City, of counsel), for intervenor Investors Diversified Services, Inc.

Arnold & Porter, Washington, D. C., G. Duane Vieth and James R. McAlee, Washington, D. C., of counsel, for intervenor Gamble-Skogmo, Inc.

Jenkens, Anson, Spradley & Gilchrist, Dallas, Tex., Holman Jenkens and Walter M. Spradley, Dallas, Tex., of counsel, for intervenor John D. Murchison.

Walter P. North, Associate General Counsel (Philip A. Loomis, Jr., General Counsel, Roy Nerenberg, Washington, D. C., Attorney), for respondent.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

This petition to review an order of the Securities and Exchange Commission brings us a "chapter of Alleghany" immediately succeeding the one we studied in Willheim v. Murchison, 342 F.2d 33, 35 (2 Cir.), cert. denied, 382 U.S. 840, 86 S.Ct. 36, 15 L.Ed.2d 82 (1965). The *Willheim* chapter took us through the proxy contest resulting in the victory of the Murchison brothers over Allan P. Kirby at the annual meeting of the stockholders of Alleghany Corporation in May 1961. This one begins with a transaction between the Murchisons and Gamble-Skogmo, Inc. negotiated in August 1962, and put in definite terms in October. The issue, stated at this point in incomplete fashion, is whether Gamble-Skogmo thereby acquired control of Alleghany. The practical importance of this is that if it did, there was arguably a transfer "of a controlling block" of the stock of Alleghany's controlled subsidiary, Investors Diversified Services, Inc. (IDS) under § 2(a) (4) and consequent automatic termination of the investment advisory and principal underwriting contracts between IDS and various mutual funds under §§ 15(a) and (b). This, in turn, would mean that the funds would be entitled to recover the excess of the fees paid between the acquisition of control and the dates in April and May 1963 when new contracts were approved by their shareholders over the cost of performing the services—unless the Commission were to exempt the transactions from the Act's ban in whole or in part, see § 6(c), as it has sometimes done in the past. Investors Diversified Services, 30 SEC 273 (1949); T. I. S. Management Corp., 10 SEC 695 (1941); Management Associates, 9 SEC 645 (1941).

The agreements between the Murchisons, for themselves and as agents for others, and Gamble-Skogmo, Inc. and its subsidiary General Outdoor Advertising Co., here collectively referred to as the Gamble companies, contained the following principal provisions:

(1) The Murchisons would sell and the Gamble companies would buy 1,500,000 shares of Alleghany common stock at $10 per share;

(2) The Gamble companies were granted a nonassignable call on the Murchisons, exercisable until May 31, 1963, for an additional 2,000,000 shares (which the Murchisons could reduce to 1,500,000 shares) at $10 per share. For this the Gamble companies were to pay a fee equivalent to 5% per annum from September 20, 1962, to the date of purchase on the aggregate price of stock purchased up to 1,500,000 shares or, if neither the call

nor the put referred to below should be exercised, then to May 31, 1963, on the same amount.

(3) If the call was not exercised, the Murchisons could put the shares to the Gamble companies at $10 per share between June 1 and June 30, 1963.

(4) Stock purchased under the call or the put was to be paid for in 5% notes payable one-half on January 31, 1964, and one-half on January 31, 1965, collateralized by a pledge of the stock.

(5) If either the call or the put were exercised, the Gamble companies would have the right during a 20-day period beginning on the 200th day after the transfer, to put to the Murchisons any additional Alleghany stock otherwise acquired prior to September 20, 1963, up to 1,000,000 shares, at cost but not in excess of $10 per share, provided the Gamble companies then owned shares in excess of the number acquired from the Murchisons by virtue of the provisions of the agreement that have been outlined.[1]

The agreements contained no provision for resignation of any of the directors.

The sale of the 1,500,000 Alleghany shares was consumated October 5, 1962. At an Alleghany directors' meeting on October 9, two of the ten directors who had been on the management slate at the uncontested 1962 stockholders' meeting resigned and were replaced by Bertin C. Gamble and one of his attorneys, James W. Deer; also a director resigned from the five-man Executive Committee and Gamble was chosen to fill the vacancy. On December 13, 1962, John D. Murchison resigned as president of Alleghany and Gamble succeeded him.

Section 2(a) (9) of the Investment Company Act provides:

Sec. 2(a) When used in this title, unless the context otherwise requires—

\* \* \* \* \* \*

(9) "Control" means the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company.

Any person who owns beneficially, either directly or through one or more controlled companies, more than 25 per centum of the voting securities of a company shall be presumed to control such company. Any person who does not so own more than 25 per centum of the voting securities of any company shall be presumed not to control such company. A natural person shall be presumed not to be a controlled person within the meaning of this title. Any such presumption may be rebutted by evidence, but except as hereinafter provided, shall continue until a determination to the contrary made by the Commission by order either on its own motion or on application by an interested person. If an application filed hereunder is not granted or denied by the Commission within sixty days after filing thereof, the determination sought by the application shall be deemed to have been temporarily granted pending final determination of the Commission thereon. The Commission, upon its own motion or upon application, may by order revoke or modify any order issued under this paragraph whenever it shall find that the determination embraced in such original order is no longer consistent with the facts.

Phillips filed an application with the SEC under this section in mid-December 1962. He alleged, among other things, his stock ownership in four mutual funds with which IDS had investment advisory and principal underwriting contracts, the Gamble companies' purchase of approximately 15% of Alleghany's outstanding

---

[1]. The Gambles were also given a call for three years beginning September 20, 1962, and the Murchisons a put for 15 days thereafter on 80,000 shares of voting and 20,000 shares of non-voting IDS common, at $240 per share for the call and $200 for the put. Further the Gamble companies were given certain rights of first refusal on an additional 82,704 non-voting IDS shares.

voting shares [2] and, to such extent as he knew the details, the other facts stated above. He sought a determination that the Commission "should deem as rebutted the presumption that the Gamble Group does not control Alleghany Corporation and therefore IDS by reason of the fact that it does not presently own beneficially * * * more than 25% of the voting securities of Alleghany." On January 2, 1963, the SEC set the application for hearing. After denial of motions by various parties to dismiss on the grounds that Phillips was not an "interested person" and that § 2(a) (9) was not intended to be used in aid of a suit for the recovery of advisory or underwriting fees, IDS filed an application seeking determinations (a) that the presumption that the Murchisons did not have power to exercise a controlling influence over Alleghany had been rebutted, (b) that the presumption that Kirby, allegedly the owner, along with his associates, of more than 3,000,000 Alleghany common shares, had power to exercise a controlling influence was confirmed, and (c) that the presumption that Murray D. Lincoln, head of Nationwide Corporation, an insurance holding company, and/or companies controlled by or associated with him, who were believed to have acquired approximately 1,000,000 Alleghany shares "in partnership" with Kirby did not have power to control Alleghany had been rebutted.[3] The Commission set the application for a hearing, to be consolidated with that already ordered on Phillips' petition; it also granted motions under § 6(c) of

the Act exempting all affected persons from the 60-day provisions of § 2(a) (9) pending final determination. Hearings continued until September 16, 1963, and a vast record was accumulated. In June 1964 the Hearing Examiner rendered a recommended decision substantially denying Phillips' application and granting that of IDS. By opinion and order dated May 11, 1966, Investment Company Act Release No. 4595, the SEC agreed. Meanwhile new contracts between IDS and the funds had been approved by the stockholders in the spring of 1963, and in the fall of that year transactions were completed whereby control was vested in Kirby and his allies beyond all possible shadow of doubt.[4]

The lapse of time and the change in circumstances give a certain air of unreality to our review of the Commission's determination as to who controlled Alleghany five years ago. This is heightened by the position taken in Fundamental Investors, Inc., 41 SEC 285 (1962), which we followed in Willheim v. Murchison, supra, 342 F.2d at 38 n. 6, whereby Phillips need not have resorted to the SEC at all but could have brought a derivative action to recover the excess fees as he did in the *Willheim* case.

▬ Although no one has contested our jurisdiction, we must consider initially whether a decision so seemingly academic is reviewable under § 43(a) of the Investment Company Act. The fact that the SEC's determination has the form of an order is not decisive; the question remains whether it is the

---

2. To wit, 9,812,261 of common and 518,677 of preferred, each of which was convertible into 4.7 shares of common upon payment of $3.75 per common share. There were also 1,089,358 common stock warrants outstanding. Common stockholders were entitled to elect eight directors to Alleghany's ten men Board; preferred shareholders, two.

3. The application also sought a determination, apparently not pressed, confirming the presumption that Alleghany controlled IDS.

4. On October 31, 1963, Kirby and two new allies, Allied Properties and Coral Ridge Properties, bought 1,600,000 shares from the Gamble companies at $10.50 per share; simultaneously the Gamble companies exercised their call on the Murchisons and received 1,834,755 common shares, the call-put arrangement having been extended. The result was that Kirby and his associates, including the Nationwide Companies, owned some 5,800,000 Alleghany shares as against Gamble's 1,734,755. On December 4, 1963, they installed a new board of directors with Kirby as chairman.

kind of order that Congress instructed us, or under Article III of the Constitution could instruct us, to review. The nature of the order calls to mind Mr. Justice Brandeis' much quoted statement, made in holding ICC valuation orders unreviewable:

> "The so-called order here complained of is one which does not command the carrier to do, or to refrain from doing anything; which does not grant or withhold any authority, privilege, or license; which does not extend or abridge any power or facility; which does not subject the carrier to any liability, civil or criminal; which does not change the carrier's existing or future status or condition; which does not determine any right or obligation." United States v. Los Angeles & Salt Lake R. Co., 273 U.S. 299, 309–310, 47 S.Ct. 413, 414, 71 L.Ed. 651 (1927).

But the pronouncement in the *Los Angeles* case, however understandable in light of the heavy and largely unnecessary burden a contrary ruling would have thrust on the courts, is only dubiously reconcilable with such later decisions as Shields v. Utah Idaho Central R. R., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111 (1938); Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939); and Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956). Moreover, we see no escape from the argument that if Phillips should now bring an action he would be met with the Commission's order in this proceeding[5] and that if the order is ever to be reviewed, that must be done here. While it might have been better if Congress had provided for the review of such an order in an action where it was immediately consequential, that was not what Congress did.[6] Compare General Protective Committee for the Holders of Option Warrants of United Corporation v. SEC, 346 U.S. 521, 74 S.Ct. 261, 98 L.Ed. 339 (1954).

Although Phillips had asked the Commission to find the presumption of non-control arising from Gamble's ownership of less than 25% of the Alleghany stock to have been rebutted, further investigation led him to press, as an alternative, the position that in fact the Gamble companies owned more than 25% so that the affirmative presumption would apply. Beginning with the proposition that an arrangement whereby the purchaser can call for additional shares and the seller can put them if he doesn't is different from an outright sale only by a hair's breadth, Phillips argues that here it was understood from the outset that in one way or another the Gamble companies were to acquire the entire 3,500,000 shares. He points to the "fee" for the call, which amounted to interest on the price of the purchased stock, whether called or put, and the absence of any fee for the put. He suggests that the only reason for these complicated and unusual arrangements was a desire to avoid the presumption of control arising from more than 25% ownership and the serious consequences that would ensue. He relies also on various statements by Gamble and his lawyer that Gamble had acquired control and the Murchisons were "out," and upon the language of several documents that Phillips believes to allow but one construction.

■ Whatever force these and other arguments have in supporting Phillips' original position that the negative presumption had been rebutted, they are insufficient to persuade us to set aside the SEC's conclusion that the affirmative presumption did not become applicable. The statute focuses attention upon the ownership of voting stock because

---

5. We note for clarity that nothing in this opinion decides the effect that an SEC order upholding Phillips' contentions would have had in such an action, where the court would be obliged to examine the impact of a shift in control in the parent corporation upon the investment advisor and underwriter, see Willheim v. Murchison, supra, 342 F.2d at 37; cf. *Management Associates*, supra.

6. Perhaps one reason was that an action to recover excess fees would not necessarily be in a federal court, see § 44.

substantial voting power generally implies substantial influence. But the put-call agreement does not grant Gamble the power to vote the Murchisons' stock. Moreover, while the parties doubtless expected that either the call or the put would be exercised, the Commission was justified in finding that they were not certain and that the arrangement was not tantamount to a sale; indeed the agreement specifically provides what payment should be made if neither put nor call were exercised. The oral statements as to control when taken in context are not inconsistent with the terms of the written agreement—Gamble had the power to get the additional votes whenever he wanted and was willing to pay; and the documents upon which Phillips relies do not unambiguously point in his direction.

The decision that the negative presumption had not been rebutted presents a closer question. After reviewing various administrative and judicial decisions as to what constitutes a "power to exercise a controlling influence over the management or policies of a company," the Commission made the following statement:

> "We agree with and reaffirm these principles. In applying them, however, it must be borne in mind that control determinations involve issues of fact which cannot be resolved by the use of a mathematical formula. They require a careful appraisal of the over-all effect of the various relationships and other circumstances present in the particular case, some of which may point to one inference while others to an opposite one. And where two equally reasonable inferences may be drawn from a set of circumstances, one consistent with the presumption established in the statute and the other not, it is the former which we must

adopt, since the person seeking to rebut the presumption has the burden of proving the contrary by a preponderance of the evidence."

█ Although the point had not been raised by petitioner, we indicated at the argument that we were concerned over the last sentence. The classical view, supported by the great authority of Dean Wigmore, 9 Evidence § 2491, and decisions dealing with both common law and statutory presumptions,[7] is that these merely relieve the proponent of the need to produce evidence to get his case to the trier of the facts. But see Morgan, Instructing the Jury upon Presumptions and Burden of Proof, 47 Harv.L.Rev. 59, 82–83 (1933); Reaugh, Presumptions and the Burden of Proof, 36 Ill.L. Rev. 819, 831–33 (1942); McCormick, Evidence § 316 (1954). Assuming the SEC to have been warranted in believing that Congress meant to do something more meaningful than provide that ownership in excess of 25% would justify a conclusion of control without other evidence whereas ownership of that amount or less would not, we can still see no basis for thinking Congress had gone beyond an imposition of the burden of proof and had directed the Commission to consider every piece of evidence with a bias in favor of the presumption.

Pursuant to our permission Associate General Counsel for the Commission served and filed a letter addressed to this point. Acknowledging that the final sentence in the quoted language was not altogether fortunate, he urged that in effect the SEC was doing nothing more than enunciate the accepted principle that where either of two equally probable but inconsistent inferences can be drawn from the evidence, neither is deemed to be proved and decision must go against the party having the burden of proof.[8] The letter noted that, apart from any

7. See, e. g., Del Vecchio v. Bowers, 296 U. S. 280, 56 S.Ct. 190, 80 L.Ed. 229 (1935); Harlem Taxicab Ass'n v. Nemesh, 89 U.S. App.D.C. 123, 191 F.2d 459 (D.C.Cir. 1951); Hertz v. Record Publishing Co., 219 F.2d 397 (3 Cir.), cert. denied, 349

U.S. 912, 75 S.Ct. 601, 99 L.Ed. 1247 (1955).

8. See, e. g., Dreijer v. Girod Motor Co., 294 F.2d 549, 556 (5 Cir. 1961); Pittman v. West American Ins. Co., 299 F.2d 405, 411 (8 Cir. 1962).

effect of the presumption, Phillips had this burden under the APA as "the proponent of a rule or order." 5 U.S.C. § 556. Cited in support of the position taken in the letter was the quite analogous case of Koppers United Co. v. SEC, 78 U.S.App.D.C. 151, 138 F.2d 577 (1943).

We accept the validity of this view when applied, as in the *Koppers* case, to the evidence as a whole, although we question whether it would be right to apply it to each particular piece. While the quoted sentence may be ambiguous on this, the SEC's reference to "a set of circumstances" reads on the whole quite as well as it does on a part. Examination of the Commission's opinion does not disclose that in considering what inference to draw from particular pieces of evidence, it felt itself under any compulsion to make the presumption prevail.[9] Although SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), would forbid our sustaining the Commission on a view of its counsel which the agency might not itself entertain, cf. NLRB v. Lundy Mfg. Co., 286 F.2d 424, 426 (2 Cir. 1960), that is not the situation here; counsel has rather supplied us with an interpretation of the agency's language consistent with both what it said and what it did. Under the circumstances here presented the *Chenery* decision does not compel a reviewing court to direct a remand which would almost certainly be an exercise in futility. Compare Baltimore & Ohio R. R. v. United States, 279 F.Supp. 316, 354 (S.D. N.Y.1967), aff'd, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968).

The facts earlier summarized show that Phillips began with a strong case for rebutting the negative presumption. But there was much on the other side. Perhaps most important was the absence of the common provision whereby a purchaser of stock from those in control of a corporation could secure a majority of the board of directors, see Essex Universal Corp. v. Yates, 305 F.2d 572, 13 A.L.R.3d 346 (2 Cir. 1962). Even if, as Phillips argues, the reason for this omission was a fear that any agreement to that effect would afford basis for automatic termination of IDS' underwriting and advisory contracts, Gamble's lack of power to obtain a majority of the board is nonetheless significant unless the directors were acting as dummies for him, and the Commission was justified in finding they were not. Four of the six Murchison directors were associated in other businesses with the two brothers, who were themselves directors, and there is substantial evidence to support the Commission's finding that a majority of the Board remained responsive to the Murchisons rather than to Gamble.[10] Though Gamble was elected President on December 13, the chief operating executive continued to report to John D. Murchison.

Phillips argues correctly that to find Gamble in "control" it is not necessary to find that he succeeded in influencing policy—it is enough if he had the power to do so. Since Gamble concededly had the legal power to deprive the "controlling" Murchison group of most, perhaps all, of its remaining stock, we are asked to reverse the Commission

---

9. A possible exception is a statement made in discussing the significance of the contract price of $10 per share as against a lower market price,

> "Moreover, an inference that any premium was related to the contemplated transfer pursuant to the put and call agreement of the presumptively controlling block owned by the Murchisons and their associates is equally as reasonable as is an inference that the premium was for an immediate transfer of control."

We think this view, if anything, understated the case. Moreover, for reasons later developed, the entire matter does not seem nearly so significant to us as it does to Phillips.

10. In view of Gamble's lack of control of the board of directors we find Phillips' claim that the Commission's decision cannot be squared with our statements in *Willheim*, 342 F.2d at 38–39, as to the effect of a putative sale of Kirby's less than 25% holdings in 1960, to be unpersuasive.

on this basis alone. However, in assessing an individual's potential influence, the Commission is obliged to consider not merely legal power but "the special circumstances of each case," Rochester Telephone Corp. v. United States, supra, 307 U.S. at 145–146, 59 S.Ct. at 764 (1939), and the agency has been alive to this obligation, see 2 Loss, Securities Regulation 770–783 (1961),

■ If Gamble had been as steadfast in his purpose as was Kirby, the Commission would have been justified in concluding that he had a controlling influence and might even have been required to do so. The Commission found, however, that Gamble was not nearly as stouthearted as his foe, but instead "was aware that his status in Alleghany during the course of his negotiations with Kirby was of a tenuous nature. * * *" Substantial evidence supports this finding. Not satisfied with his own massive stock ownership which, along with that of his participants and associates, had aggregated 3,303,289 shares at the 1961 stockholders' meeting, and his huge personal resources, Kirby had been in pursuit of allies. Just at the time when Gamble was talking with Kirby and formalizing the contracts with the Murchisons, Kirby and Lincoln were having private conversations with a view to the Nationwide Companies' purchasing enough Alleghany shares that in combination with Kirby's the two interests would come close to having a majority with their own stock alone. Shortly after Gamble heard of these negotiations, he announced to the Board that he either would buy Kirby out or sell his own shares. On the same day discussions with the Kirby group began and it rapidly became apparent who would be doing the selling. It is true that Gamble's position was not altogether hopeless at this point in time—the put-call arrangements were intended to empower him to vote between 4 million and 4.5 million shares at a 1963 stockholders' meeting, about the same number as his opponents', and put the last million shares to the Murchisons after the meeting was over. Nevertheless, as Phillips himself stated in his brief before the Commission, "in December 1962 and thereafter in 1963, Gamble lost his nerve when faced with the possibility of a coalition of the Kirby and Nationwide forces and did not maintain himself in control. * * *" It is easy to understand why; the prospect of having to go through annual proxy contests of uncertain issue against an adversary like Kirby would not warm the most hardened fighter and Kirby's gain of an ally was a signal to Gamble that not only his opponent would be stronger than in 1961 but that peaceful coexistence would be impossible. If Gamble capitulated so quickly in December, the SEC was justified in finding his pre-December power position was also "tenuous." It would be unprofitable to prolong this opinion by commenting on all details that Phillips has ably presented; the short of the matter is that the SEC was warranted in concluding that although Gamble wanted and expected to be able to exercise a controlling influence over Alleghany, he never made the grade. Compare Koppers United Co. v. SEC, supra.

■ Just as Gamble's stock position yielded him little in the way of power, there is substantial evidence to support the Commission's finding that the Murchisons retained a controlling influence—whatever the legal effect of this finding may be—despite the fact that at least the bulk of their remaining shares were subject to the put-call arrangements. Not only had the Murchisons selected eight Directors and all but one of the major officers, but their views were generally translated into company policy, except when Kirby's opposition was effective. The Commission was justified in giving especial weight to these factors during this transitional period. See American Gas & Electric Co. v. S.E.C., 77 U.S.App.D.C. 174, 134 F.2d 633, 642–643 (Rutledge, J.), cert. denied, 319 U.S. 763, 63 S.Ct. 1318, 87 L.Ed. 1713 (1943); *Transit Investment Corp.*, supra (owner of 3% of the stock had a controlling influence).

By the terms of the statute, Kirby is presumed to have a controlling influence. Since the evidence clearly indicates that his opposition to Murchison policies often frustrated their realization and, in fact, motivated their decision to sell to Gamble, the Commission was warranted in finding the presumption had not been rebutted.

The petition to review is denied.