Simon V. **HABERMAN**, Plaintiff,

v.

John D. **MURCHISON** and Clint W. **Murchison**, individually and as partners d/b/a **Murchison Brothers, et al.,** Defendants.

**No. 68 Civ. 3791.**

United States District Court,
S. D. New York.

Sept. 13, 1971.

Bennett Frankel, New York City, for plaintiff.

Debevoise, Plimpton, Lyons & Gates, New York City, for defendants John D. Murchison, Clint W. Murchison, Jr. and Murchison Brothers, by J. Asa Rountree, Hugh Rowland, Jr., Bruce R. Kohler, New York City, of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendant Donald D. Harrington, by Paul W. Williams, Raymond L. Falls, Jr., Joel C. Balsam, New York City, of counsel.

## OPINION

GURFEIN, District Judge.

After the filing of an amended complaint, the Murchison defendants and defendant Harrington move for summary judgment. The plaintiff moves for summary judgment only against these defendants.

The original complaint in a single count was dismissed by Judge Bryan (Smith v. Murchison, 310 F.Supp. 1079 [1970]) as stating no claim for relief over which this Court has jurisdiction under the Securities Exchange Act of 1934. He sustained jurisdiction on the same cause of action founded on diversity of citizenship which was assumed *arguendo*. Later, after a transfer had been ordered to the District Court for the Northern District of Texas, a New York resident plaintiff, Haberman, was substituted for Smith, the original plaintiff who was a New Jersey resident, and Judge Bryan vacated his order of transfer. The action is brought as a derivative action on behalf of Alleghany Corporation and of stockholders similarly situated.[1] The original complaint was filed on September 20, 1968.[2]

With the substitution of Haberman as the nominal plaintiff the complaint was also amended to plead three counts, the first count remaining in *haec verba,* and the second and third counts being framed for the purpose of avoiding Judge Bryan's grounds for dismissal for lack of Federal jurisdiction. The plaintiff apparently does not seek to relitigate that question but contends that the first count still states a claim for relief under applicable Maryland law and that the plaintiff is entitled to summary judg-

---

1. Although there is a statement that it is a representative action none of the allegations required for a Rule 23 class action are made and the Court does not treat it as a class action.

2. The amended complaint with the substitution of plaintiffs was filed on April 16, 1970.

ment on that count and on the second and third counts as well. The defendants contend that the amended allegations in Counts II and III fail to meet the legal deficiencies found by Judge Bryan as to a claim under the 1934 Act and that none of the Counts states a claim for relief under State law. Finally, as to all Counts, the defendants claim that the statute of limitations has run and that, therefore, summary judgment must be granted.

## JUDGE BRYAN'S HOLDING ON FEDERAL QUESTION JURISDICTION

The allegations of the original complaint are stated in 310 F.Supp. 1079 at 1082–1083. The transaction involved an interlude in the proxy battle between the Murchisons, who are defendants here, and Kirby who is not. It will be remembered that the Murchisons in April 1965 ousted Kirby from control of Alleghany, an investment company which controlled Investors Diversified Services, Inc. (IDS) and the New York Central Railroad Co. (Central). Kirby and his affiliates, though he was not on the board, owned the largest single block of Alleghany stock—about 33% of the shares. The Murchisons and their affiliates held about 23.9% of the shares but the Murchisons controlled the board of directors without question.[3] On August 14, 1962, after preliminary conversations, the Murchisons entered into written contracts with Bertin C. Gamble acting on behalf of Gamble-Skogmo (Gamble) whereby the Murchisons acting for themselves and others, sold to Gamble 1.5 million shares of Alleghany common stock and Gamble was granted a "call" and the Murchisons a "put" with respect to an additional 1.5 to 2 million shares of Alleghany common stock. The claim of the original complaint was that the Murchisons received a premium of "$7 million above the prevailing market price and the other defendants amounts above the market price ranging from

$340,000 to $1,800,000. These amounts are alleged to be 'premiums' secured by defendants from the 'sale' of their corporate offices" (310 F.Supp. at 1082–1083). It was also alleged that certain purchases by Alleghany of its own stock, of IDS stock and of Central stock were caused to be made by the defendants in order to bolster the price of their own shares in these companies in aid of the plan and that the motive was concealed from the shareholders (310 F.Supp. at 1082).

It was alleged that in the course of the transactions it was agreed that Gamble would get two out of ten seats on the board as part of a gradual takeover and would later become President and that this was concealed; that Harrington, a defendant, stood for election as a director in April 1962 although he did not intend to serve out his one year term, and that this was also concealed.

The essence of the first claim was that the defendants had sold their offices and obtained a premium they would not otherwise have received. As a gloss upon the claim the plaintiff charged that a misleading proxy statement had been filed in April 1962 (before the Gamble transaction) which contained material misstatements unrelated to the Gamble transaction, *but for* which misstatements and omissions, it is said, the Murchison group would not have been re-elected and thus would have not had the directorships to sell at an alleged premium. The original complaint charged violations of Section 10(b) and Rule 10b–5 and Sections 13(a), 14(a) and 16(a) of the Securities Exchange Act of 1934 as well as the law of Maryland.

Judge Bryan disposed of the 10(b) and 10b–5 claim on two fundamental grounds: (1) that the transaction complained of was not "in connection with the purchase or sale, of any security" by the corporation under the familiar rule of Birnbaum v. Newport Steel Corp., 193 F.2d 461, 464 (2 Cir. 1952) and Greenstein v. Paul, 400 F.2d 580 (2 Cir. 1968);

3. As much as 10 or 11% of Alleghany stock was owned by friends and associates of the Murchisons.

and (2) that there was no allegation of loss to the corporation flowing directly from the purchase or sale. See Hoover v. Allen, 241 F.Supp. 213 (S.D.N.Y. 1965); Cohen v. Colvin, 266 F.Supp. 677 (S.D.N.Y.1967); Supt. of Ins. of State of New York v. Bankers Life, 300 F. Supp. 1083 (S.D.N.Y.1969), affd., 430 F.2d 355 (2 Cir. 1970), cert. granted 401 U.S. 973, 91 S.Ct. 1191, 8 L.Ed.2d 321 (1971). Judge Bryan also held that the purchase by Alleghany of its own stock "had no direct causal relationship to the allegedly unlawful premium" and, hence, the claim could only be one of breach of fiduciary duty under State law (Smith v. Murchison, 310 F.Supp. at 1084–1085).

Judge Bryan dismissed the claim for damages based on Section 14(a) and Rule 14a–9 on the ground that to sustain an action for violation of Section 14(a) damage as well as causal connection between the false proxy statement and the damage sustained must be alleged. See Barnett v. Anaconda Co., 238 F.Supp. 766 (S.D.N.Y.1965); Eagle v. Horvath, 241 F.Supp. 345 (S.D.N.Y. 1965); Hoover v. Allen, *supra*. No damage to the *corporation* was alleged. See Vine v. Beneficial Finance Co., 374 F.2d 627, 637 (2 Cir. 1967); cf. Mills v. Electric Autolite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

He dismissed the claims under Sections 13(a) and 16(a) because there was no showing of causative effect or damage to the *corporation* from false filing or late filing of reports required under those sections. For example, the allegation that Forms 4 were filed late for purposes of concealment could have effect only on discovery of the transaction by shareholders but could have inflicted no damage upon the corporation itself. We agree with all these rulings of Judge Bryan on the Federal claims in the first count for they are based on existing precedent.

## THE STIPULATION

The parties have agreed that the motions and cross-motions should be decided on the basis of the following signed stipulations:

"IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned, that the transcript of the testimony in the SEC proceeding entitled *Investors Mutual, Inc.*, File No. 812–1550, and the exhibits which were introduced in evidence therein, may be used for all purposes by the Court herein, in determining the pending motions and cross-motions for summary judgment, as if such testimony had been taken, and such exhibits had been introduced, in this action."

and

"IT IS HEREBY STIPULATED AND AGREED that in determining the pending motions and cross-motions for summary judgment, no issue of credibility exists with respect to the testimony in the SEC proceedings entitled 'Investors Mutual Inc.' File No. 812–1550, and the exhibits introduced in evidence therein."

While there is some divergence in the 9g statements submitted under our Court rules, the later stipulations make the submission equivalent to an agreed statement of facts. The testimony and exhibits are to be treated not as marked for identification but as "introduced in this action." At least none of the testimony and none of the exhibits introduced at the SEC proceeding is controverted. The stipulation makes this case different from most summary judgment submissions and we treat it accordingly.

The issues here presented are: (a) whether Count 1 (even though its Federal claims were dismissed by Judge Bryan and there has been no repleading) states a claim for relief under State law based on diversity of citizenship; (b) whether Counts 2 and 3 state a claim for relief under State law; and (c) whether Counts 2 and 3, added *after* Judge Bryan's decision, now state claims for relief under the Securities Exchange Act of 1934.

## THE STATE LAW CLAIM
## OF FIRST COUNT

It is stipulated that "no issue of credibility exists with respect to the testimony in the SEC proceedings." If the testimony of John and Clint Murchison and Gamble is conceded to be truthful, there is no room for contradiction by circumstantial evidence of motive or of secret agreement. For their testimony completely defeats the charge of conspiracy. It establishes the following: (1) Gamble agreed to buy Murchisons' shares knowing they did not represent control; (2) he asked for some representation on the board of Alleghany and received two seats out of ten; (3) there was no agreement that the Murchisons' directors would vote as Gamble directed; (4) on the two major policy issues which arose, the recapitalization of IDS and the bringing of a lawsuit against Kirby, Gamble's views were rejected; (5) there was no discussion of the Presidency until the day before Gamble's election as President in December 1962, a couple of months after the transaction of October 5; (6) no premium was taken into account for Gamble's receiving two directorships, the price for the Murchison shares having been suggested by an investment banker, Charles Allen, at approximate book value of the Alleghany shares; (7) as to Harrington, he had no knowledge of the Murchisons' negotiations with Gamble and was first asked to sell his shares to Murchison in early October 1962, a few days before the October 5 sale. The price he received was fixed by negotiation between John Murchison and Harrington. There was no talk of a premium for resignation. He had decided to resign as a director earlier and had run for reelection only because Murchison requested him to stay on. When he sold out he naturally carried out his original inclination and resigned; (8) Murchisons did not reveal Gamble's offer to the other Alleghany shareholders, nor did they offer them a chance to participate; (9) Murchisons did offer some of their associates a chance to participate in the Gamble sale; and (10) Murchisons did not make a public announcement or file information concerning the put-call agreement described.

This testimony, if accepted, as it must be under the stipulation, established the motives of the parties to these transactions by their own direct testimony stipulated to be credible. It negates the inference of a secret agreement to transfer control to Gamble on a gradual basis, for that is credibly denied. It certainly negates the theory that Gamble must have been promised the Presidency when the price was fixed. Whether such inferences could be drawn on a motion for summary judgment without the stipulations may be questioned. But in view of the stipulations the inferences that might arise as to motive from the conduct of the parties and the circumstances need no longer be left to the trier of fact. Cf. Empire Electronics Co. v. United States, 311 F.2d 175, 180 (2 Cir. 1962).[4]

Both sides seem eager to have the case disposed of on the law. To be sure, cross-motions for summary judgment do not compel a Court to grant such judgment. But here the issues are well drawn. The plaintiff apparently knows he can produce no further direct testimony. The defendants are satisfied to stand upon the record before the SEC which is not likely to be augmented in any substantial way on a trial. The weariness of all the parties is apparent. It is now almost nine years since these events occurred. Each side urges that the matter is ripe for decision—naturally in its own favor.

 The legal principles to be applied have become clearer in recent years. As to the diversity claim in the First Count alleging breach of fiduciary duty,

4. Plaintiff stated in a memorandum dated January 23, 1969, page 40, that "the testimonial and documentary record upon which plaintiffs rely to prove their federal and state claims has already been made before the SEC and reviewed [by the Second Circuit]."

it is governed by the law of Maryland, the State of Alleghany's incorporation.[5] When an actually controlling block of shares is sold and a premium obtained by the seller the transaction is, generally, not illegal; Levy v. American Beverage Corp., 265 App.Div. 208, 218, 38 N.Y.S.2d 517, 526 (1st Dept. 1942) even when the buyer is given control of the board of directors. See Essex Universal Corp. v. Yates, 305 F.2d 572, 576 (2 Cir. 1962); Manacher v. Reynolds, 39 Del. Ch. 401, 165 A.2d 741 (Del.Ch.1960); McDaniel v. Painter, 418 F.2d 545 (10 Cir. 1969). If the shares sold are less than a controlling block and there is an accompanying transfer of *control*, or a sale of corporate office, the transaction is unlawful. See McClure v. Law, 161 N.Y. 78, 55 N.E. 388 (1899); Matter of Lionel Corp., 151 N.Y.L.J. No. 24, p. 13, col. 8 (Sup.Ct.N.Y.Co. Feb. 4, 1964), affd. sub nom., In re Caplan's Petition, 20 A.D.2d 301, 246 N.Y.S.2d 913 (1st Dept.), affd. 14 N.Y.2d 679, 249 N.Y.S. 2d 877, 198 N.E.2d 908 (1964); Gabriel Industries v. Defiance Industries, Inc., 151 N.Y.L.J. No. 119, p. 13, col. 8 (Sup. Ct.N.Y.Co. June 17, 1964), affd. 29 A.D. 2d 531, 286 N.Y.S.2d 466 (1st Dept. 1967); modified, 22 N.Y.2d 405, 293 N.Y.S.2d 65, 239 N.E.2d 706 (1968). In that event a premium paid for the transfer of control would be recoverable by the corporation just as a bribe to a director would be (see McClure v. Law, *supra*). Here Gamble actually obtained only 1.5 million shares of the voting stock. The total number of voting shares was 9.8 million. As Judge Friendly said in Phillips v. S. E. C., 388 F.2d 964, 970 (2 Cir. 1968): "The put-call agreement does not grant Gamble the power to vote the [additional] Murchison stock." Without the shares which were the subject of that agreement (1.5 million to 2 million shares) Gamble only acquired about fifteen per cent of the voting stock. It would obviously be a question of fact as to whether the fifteen per

cent, in the circumstances, constituted control stock within Chief Judge Lumbard's conception in Essex Universal Corp. v. Yates, *supra*. Both sides agree, however, that the fifteen per cent block itself did not constitute the controlling block since Kirby had even more shares. Without a transfer of control the price received by the Murchisons and their associates would be immaterial. See Christophides v. Porco, 289 F.Supp. 403 (S.D. N.Y.1968). The case here is even narrower. As we have seen, Gamble did not get control because he got only two directorships out of ten, and the only evidence adduced before the S.E.C. established that the remaining Murchison directors did not act as dummies for Gamble. (Phillips v. SEC, 388 F.2d 964 at 971 [2 Cir. 1968]). See The Rights of Minority Shareholders, 26 Bus.Law 63 (Jan.1971). Indeed, on the two principal matters with which Gamble was concerned, a recapitalization of IDS stock and deferral of a lawsuit by Alleghany against Kirby he was flatly opposed by the Murchison directors. The contention, therefore, narrows to the assertion that Gamble's assumption of the Presidency of Alleghany in December 1962, several months later, was paid for by a premium attached to the purchase price as consideration for a gradual assumption of control. But, as we have seen, the direct evidence is to the contrary and there is no direct evidence before the SEC or in the papers submitted to support this inference. There is no testimonial contradiction of the fact that Murchison first requested Gamble to become President in December; and Gamble's statement in August 1962 to Kirby's representative Ireland, that he would offer the Chairmanship to Kirby and assume the Presidency himself is referable to the time when Gamble would have exercised his call and would own from 3 million to 3½ million shares. Gamble was, at best, President only until the next annual meeting, and there is no claim

5. This is conceded by all the parties. It should be noted that there is no precedent in Maryland which governs this case so that this Court has to do its best to predict what the law of Maryland would be rather than what it is.

that the corporation would be looted in the meantime or of any other circumstance which would justify recovery of the alleged premium. Cf. Gerdes v. Reynolds, 28 N.Y.S.2d 622 (Sup.Ct. N.Y.Co.1941); Perlman v. Feldmann, 219 F.2d 173 (2 Cir. 1955).

■ The plaintiff's contention here becomes an absolutist contention that any price above the market price received in connection with a sale of non-control stock is recoverable by the corporation if the buyer gets any corporate office whatever. The plaintiff has cited no authority that goes so far. While a circumstantial case may at times be strong enough to prove that there actually was a bargain for the sale of corporate office despite the denials of the principals, the inference would arise from the circumstances and not from the mere proof of the sale itself with a concomitant assumption of some corporate office without control. Here Gamble did not get actual control. His obtaining two board seats out of ten has been explained. It is common for a buyer with a large stake to be given recognition. His assumption of the Presidency has also been explained as unrelated to the bargain and must be accepted as credible under the stipulation.

■ The concealments purportedly shown are, indeed, troublesome but not of sufficient contradiction to the sworn testimony to make the latter inherently incredible in the face of the concession on credibility. The Murchisons failed to tell the other shareholders of Alleghany the full story of the put and call agreements which, if exercised, would result in a

total divestment of ownership by the managers of the enterprise—seven out of ten directors. But while this might be material enough to make the Murchisons responsible to shareholders who bought or sold without full knowledge of facts that should have been disclosed, it does not make them liable to the corporation, for no harm came to it from the failure to disclose. There was simply no corporate action taken as a result.[6]

The First Count, dismissed by Judge Bryan for lack of a Federal question, is also dismissed for failure to state a claim for relief under State law.

## SECOND COUNT

The Second Count was added to meet the opinion of Judge Bryan which dismissed the First Count on the Federal questions. It also claims relief under State law.

■ 1. *The 1934 Securities Exchange Act.* After realleging the paragraphs of the First Count the amended complaint charges that the defendants were not "bona fide nominees" in the annual election of directors of April 9, 1962 because they had been "frustrated" in their "program" by Kirby and failed to state *that* in the proxy statement and that they were really running for election in order to sell their shares at a premium. It is charged that but for the false proxy statement the defendants would not have been elected and hence would not have obtained the premium. This still fails to add up to proximate causation for *corporate* action or damage to the corporation which can be remedied

6. Plaintiff relies on general language in Maryland cases establishing that directors have a fiduciary duty to the corporation, a proposition with which no one disagrees. His cases are not in point on the issues raised herein since each of the cited cases involved substantial losses to the *cestui* or corporation and/or the self-dealing of fiduciaries in an unfair manner. Plaintiff points to no case which would indicate that Maryland law would permit the re-

covery of a fictitious profit under the stipulated facts in the case at bar. Cf. Indurated Concrete Corp. v. Abbott, 195 Md. 496, 74 A.2d 17 (1950); Parish v. Maryland & Virginia Milk Products Assn., 250 Md. 24, 242 A.2d 512 (1968); Waller v. Waller, 187 Md. 185, 49 A.2d 449 (1946); Cumberland Coal & Iron Co. v. Parish, 42 Md. 598 (1875); Hoffman Steam Coal Co. v. Cumberland Coal & Iron Co., 16 Md. 456 (1860).

even by a court of equity at this time. Cf. Mills v. Electric Autolite Co., *supra*. It is further alleged that the defendants damaged the corporation "by causing it to pay the expenses of solicitation of proxies." No authority has been cited for the proposition that the payment of proxy expenses alone and in a situation which presently cannot be remedied is sufficient.

■ 2. *The claim based on diversity.* The alleged false proxy statement did not affect corporate action beyond the election of the defendants to office. Their subsequent actions in allegedly obtaining premiums for the sale of offices were remote from the so called proxy fraud. We do not believe that falsity in a proxy statement for the election of directors who later commit wrongs can stand on its own as a claim for relief. If wrong was done to the corporation it is actionable regardless of the mode of election of those who breached their fiduciary duty. That is sufficient protection for the corporation. If no wrong was actually done to the corporation, the preparation for such wrong would not, itself, be a cause of action. The Second Count, therefore, is dismissed.

### THIRD COUNT

■ 1. *The 1934 Securities Exchange Act.* This Count is premised on the theory that the offer by Gamble to pay the Murchisons two dollars over the market price was material inside information which it was the duty of the defendants to disclose publicly to the shareholders of Alleghany and that it was the "duty of defendants to invite all the shareholders of Alleghany, instead of 37 of their associates, to participate on a pro rata basis in the sale of Alleghany stock at a 'premium.'" It is also alleged that defendants' knowledge of "frustration" of their program was "inside information" and a "corporate asset" which

defendants "converted to their own use" by obtaining the "premium." Defendants are alleged to have concealed this conversion of the corporate asset in the 1962 Annual Report of Alleghany filed with the SEC and in the November 7, 1963 proxy statement. It is claimed that these acts and omissions violated Section 13(a) and Section 14(a) of the 1934 Act and the law of Maryland. It is *not* nor could it be claimed that these acts and omissions create a claim for relief on behalf of the corporation as distinguished from its shareholders under Section 10 and Rule 10b–5 of the 1934 Act. Cf. Ferraioli v. Cantor, 281 F. Supp. 354 (S.D.N.Y.1967).

It will be seen that these additional allegations fail to meet the thrust of Judge Bryan's decision, for none of the acts complained of resulted in corporate action, their only effect being to conceal the alleged breach of fiduciary duty. If there is a claim for relief here, it is not a claim for relief under the Securities Exchange Act of 1934. Christophides v. Porco, *supra*.

■ 2. *The claim based on diversity.* The plaintiff contends in the Third Count that a corporate asset—"inside information"—was used for the sole benefit of the defendants. This alleged "inside information" was the knowledge that Gamble was offering to buy part of the Murchison block outright, with a put-call arrangement for more, at a price above the then market. The Court rejects the theory, not accepted by the Courts, that knowledge of an offer to buy a dominant shareholder's stock is "inside information" which must be shared with all other shareholders.[7] That may be so where the buyer was willing to buy all the shares at a lower price and was induced by the defendants to buy a lesser number at a higher price. See Brown v. Halbert, 271 Cal.App.2d 252, 76 Cal.Rptr. 781 (Cal.App.1969); Jones v. H. F. Ahmanson & Co., 1 Cal.

7. See Letts, "Sale of Control Stock and the Rights of Minority Stockholders," 26 Bus.Law 63 (January 1971).

3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969).

If the intimation in Ferraioli v. Cantor, *supra,* appears broader we suggest, with deference, that it must, in any event, be limited to class actions and to Section 10b violations in which there is both fraud and a "purchase and sale." So far as *State* claims are concerned we have been cited to no judicial authority in support of the view that nondisclosure of an offer made to one shareholder for his stock is, without more, actionable, or that such shareholder is under any duty to let others participate in the sale. See Christophides v. Porco, *supra.* We believe, in the absence of contrary authority, that the law of Maryland is not different. If the "inside information" is not *corporate* information, there has been no misuse of a corporate asset. The salutary doctrine that even if no harm came to the corporation it may nonetheless recover profits from directors who derived secret advantage from inside corporate information is not here involved. Cf. Diamond v. Oreamuno, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E. 2d 910 (1969).[8] There appears to be no issue of fact to resolve in the Third Count which is, therefore, dismissed.

Since we have held that summary judgment should be granted in favor of the defendants we need not pass on the defendants' contention that the claims are, in any event, time barred.

---

8. The only claim of unlawful use of a corporate asset that would require consideration is the claim that the defendants caused Alleghany to buy its own stock and shares of IDS and Central to bolster their respective prices and thus enable the defendants to get more for their shares. Standing alone such conduct would, of course, be actionable. But here the allegation is made that the conduct was only a means to furthering the "illegal plan" to sell corporate offices for a premium. There is no allegation that the price paid was too high or that the corporation was harmed; in fact, the purchased stock went up in price. Indeed, the purchases were all before June 30, 1962, and Allen did not introduce Murchison to Gamble until July of that year. If, indeed, there had been misconduct in obtaining a premium, and we have held there was none on this record, the lack of harm to the corporation would not have defeated an action based on unjust enrichment. The wrongdoing directors, in such cases, would have been accountable to the corporation for their profits. See e. g., Diamond v. Oreamuno, *supra.* That is not the case here.