**Simon V. HABERMAN, Plaintiff,**

v.

**John D. MURCHISON et al., Defendants.**

**No. 68 Civ. 3791.**

United States District Court,
S. D. New York.

Dec. 14, 1971.

Bennett Frankel, New York City, for plaintiff.

Debevoise, Plimpton, Lyons & Gates, New York City, for defendants John D. Murchison, Clint W. Murchison, Jr. and Murchison Brothers by J. Asa Rountree, Hugh Rowland, Jr., Bruce R. Kohler, New York City, of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendant Donald D. Harrington by Paul W. Williams, Raymond L. Falls, Jr., Joel C. Balsam, New York City, of counsel.

GURFEIN, District Judge.

## SUPPLEMENTAL OPINION

A motion for reargument is made by the plaintiff under Rule 9(m) of the General Rules. The motion is granted and the briefs and letters submitted will be treated as the reargument.

Plaintiff moves, upon reargument, for summary judgment on two grounds: (1) that the recent decision of the Supreme Court in Supt. of Insurance v. Bankers Life, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128, 1971, requires holding valid the federal claims previously dismissed by Judge Bryan and myself[1]; and (2) that the Court misinterpreted the stipulation of the parties and failed to consider evidence before the SEC favorable to the plaintiff.

### 1. The Bankers Life case.

The original first cause of action herein charged a sale of "control" of the Alleghany Corporation by the defendants to Gamble-Skogmo (Gamble) under circumstances allegedly constituting fraud under Section 10(b) and Rule 10b–5 of the 1934 Act, as well as antecedent fraud in a proxy statement in violation of Sections 13(a), 14(a) and 16(a) of that Act. Judge Bryan dismissed the claim. He held that (1) the transaction complained of was not "in connection with the purchase or sale of any security [by the corporation]" under Birnbaum v. Newport Steel Corp., 193 F.2d 461, 463 (2 Cir. 1952) and Greenstein v. Paul, 400 F.2d 580 (2 Cir. 1968); and that (2) there was no allegation of loss to the corporation flowing *directly* from the purchase and sale under Hoover v. Allen, 241 F.Supp. 213 (S.D.N.Y.1965); Cohen v. Colvin, 266 F.Supp. 677 (S.D.N.Y.1967); Supt. of Ins. v. Bankers Life, 300 F.Supp. 1083 (S.D.N.Y.1969), aff'd, 430 F.2d 355 (2 Cir. 1970). [The latter case has now been reversed.]

In the cross-motions for summary judgment that came before me the plaintiff did not seek a reargument of Judge Bryan's decision on the non-existence of a federal claim but merely sought to sustain the first count under Maryland law. In fairness to the present position of the plaintiff with respect to the recent *Bankers Life* decision of the Supreme Court, however, I shall treat the motion as directed to Judge Bryan's original opinion and my own concurrence with it.

■ The *Bankers Life* decision does not affect the prior decisions of this Court that there is not a Section 10(b) case here. In the present case, the allegation is that the defendants sold stock in the Alleghany Corporation to a third party. Alleghany was not a party to the sale. In the *Bankers Life* case, while it is true that Bankers Life sold the shares in the Manhattan Casualty Company (Manhattan) to one Begole, the similarity to our case ends there. For the essence of the Section 10(b) fraud was the compelled sale *by Manhattan* of five million dollars worth of U. S. Treasury Bonds for which it did not receive the proceeds and which were converted to the use of Begole. The Supreme Court held that Manhattan was a *seller* of the Treasury Bonds—which it surely was—and hence could be defrauded "in connection with the purchase or sale of a security." Mr. Justice Douglas wrote: "The crux of the present case is that Manhattan suffered an injury as a result of deceptive practices touching its sale of securities as an investor" (Slip. Op. p. 6). If the "crux of the case" was injury to Manhattan there is no allegation, in this derivative suit, of comparable injury to Alleghany, the real plaintiff.

To make it clear that all the Court was deciding was the Section 10(b) claim relating *to Manhattan's sale of the Treasury Bonds* and nothing else, Mr. Justice Douglas wrote in footnote 10:

"Petitioner's complaint bases his single claim for recovery alternatively

1. The plaintiff also relies on the recent decision by the Court of Appeals in Rosen- feld v. Black, 445 F.2d 1337, 1342 (2 Cir. 1971).

on three different transactions alleged to confer jurisdiction under § 10(b); Manhattan's sale of the Treasury bonds; the sale of Manhattan stock by Banker's Life to Bourne and Begole; and the transactions involving the certificates of deposit. We only hold that the alleged fraud is cognizable under § 10(b) and Rule 10b–5 in the bond sale and we express no opinion as to Manhattan's standing under § 10(b) and Rule 10b–5 on other phases of the complaint. See Kellogg, The Inability to Obtain Analytical Precision Where Standing to Sue under Rule 10b–5 is Involved, 20 Buff.L.Rev. 93 (1970); Lowenfels, The Demise of the *Birnbaum* Doctrine: A New Era For Rule 10b–5, 54 Va.L.Rev. 268 (1968)."

Accordingly, *Birnbaum* is left where it was. As to the earlier requirement of *direct* loss to the corporation, as exemplified in Hoover v. Allen, *supra*, the Supreme Court may have made the requirement less rigid. Indirect loss may now be enough to found federal jurisdiction under Section 10(b) but loss there must be to the plaintiff corporation in any event. Here there is no allegation that Alleghany itself lost any money.[2]

Rosenfeld v. Black involved neither the question of who is a purchaser or seller under the 1934 Act nor the question of direct loss to one who was not a seller. It has no special application to the facts of this case.

*2. The stipulation.*

The stipulation, freely entered into by the parties, came about in the following way.[3] At the oral argument of the cross-motions for summary judgment it was suggested that the Court could read the testimony taken before the SEC in the Investors Mutual proceeding. When I came to read the papers I wanted to make certain that the parties were agreed upon what the stipulation embraced. I, accordingly, asked for a written stipulation, in no way suggesting what it should be. There resulted a signed stipulation which is the first paragraph set out in the margin. Not being certain of its meaning, I asked the parties to clarify it in whatever way they wished. The second paragraph was then tendered to the Court.

The plaintiff now contends that the Court's finding is not based "on the record as a whole" and is an inequitable application of the "credibility" stipulation. In view of the circumstance that the plaintiff has now sharpened his brief, and, by his own statement, included references he had previously failed to call to the attention of the Court, I have reviewed again all the testimony and documents that were before the SEC. The plaintiff suggests that a proper reading of the stipulation means that the Court should reach its conclusion by finding the preponderance of credible evidence.

Whether there was a premium paid for the sale of "control" is the ultimate fact question. There is direct testimony by Gamble that he knew the Murchison shares he had bought did not represent control; he also denied buying control. Moreover, the SEC and Judge Friendly[4]

2. The second and third claims in the amended complaint did not allege a 10b-5 violation and need not be reexamined.

3. The stipulation reads:
"IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned, that the transcript of the testimony in the SEC proceeding entitled Investors Mutual, Inc., File No. 812–1560, and the exhibits which were introduced in evidence therein, may be used for all purposes by the Court herein, in determining the pending motions and cross-motions for summary judgment, as if such testimony had been taken, and such exhibits had been introduced, in this action."
–and–
"IT IS HEREBY STIPULATED AND AGREED that in determining the pending motions and cross-motions for summary judgment, no issue of credibility exists with respect to the testimony in the SEC proceedings entitled 'Investors Mutual Inc.' File No. 812–1550, and the exhibits introduced in evidence therein."

4. Phillips v. SEC, 388 F.2d 964 (2 Cir. 1968).

found that "the put-call agreement does not grant Gamble the power to vote the [additional] Murchisons' stock." Against this, the plaintiff urges that a statement by Callahan, Gamble's attorney, to Kirby & Ireland, his attorney, on August 1, 1962, that Gamble had made a deal with the Murchison brothers to acquire approximately 3½ million shares of Alleghany common stock and their entire holdings in IDS, and statements by Gamble to Kirby and Ireland that he had acquired control, preponderate over Gamble's contrary testimony. The issue of fact thus posed is very much like that posed in the SEC proceeding which was reviewed in Phillips v. SEC, 388 F.2d 964 (2 Cir. 1968). There Judge Friendly noted, as I do, independently, that "[the plaintiff] relies also on various statements by Gamble and his lawyer that Gamble had acquired control and the Murchisons were 'out', and upon the language of several documents that Phillips [plaintiff there] believe[d] to allow but one construction" (388 F.2d at 969). Judge Friendly commented that "the oral statements as to control when taken in context are not inconsistent with the terms of the written agreement—Gamble had the power to get the additional votes whenever he wanted and was willing to pay; and the documents upon which Phillips relies do not unambiguously point in his direction" (id. at p. 970).[5] Judge Friendly went on to say: " . . . Gamble's lack of power to obtain a majority of the board is nonetheless significant unless the directors were acting as dummies for him, and the Commission was justified in finding they were not. Four of the six Murchison directors were associated in other businesses with the two brothers, who were themselves directors, and there is substantial evidence to support the Commission's finding that a majority of the Board remained responsive to the Murchisons rather than to Gamble. Though Gamble was elected President on December 13, the chief operating executive continued to report to John D. Murchison" (id. at p. 971).[6]

The ultimate issue before the Court of Appeals was whether control of Alleghany had been transferred to Gamble so as to create an assignment of the investment advisory contract of IDS, concededly a "controlled subsidiary of Alleghany." Here the issue is whether the same "control" of Alleghany passed to the same third party, Gamble, so that a "premium" paid for such control is recoverable by Alleghany.

"Control" of an investment company is defined by the statute. The Investment Company Act of 1940 (15 U.S.C. § 80a–2(a) (9)) provides that " 'control' means the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position within such company." The section provides further that ownership of more than 25 per centum of the voting securities is presumed to mean control, and conversely the ownership of less than 25 per centum is presumed to mean no control.

Without the benefit of the presumption I find from all the facts, as the SEC did, that "[Gamble] was aware that his status in Alleghany during the course of his negotiations with Kirby was of a tenuous nature" (388 F.2d at 972). There is little doubt that if Kirby

---

5. In the original opinion I did mention Ireland's testimony about Gamble's statement of August 2, 1962, but without detail. The boasts of Gamble were obviously to impress Kirby who apparently refused to run scared. On October 10, 1962 Kirby's attorney, Ireland, told Callahan, Gamble's attorney, "that he, Kirby, was not saying, or stating, or even making up his mind as to what his position with respects (sic) to Mr. Gamble would be in Alleghany." (Ex.G, Rountree Affd. p. 86a; Suppl.App. in Phillips v. SEC in Court of Appeals.)

6. Ireland testified that Callahan told him that a Vice-President is now clearing everything with Burt [Gamble] (Ex.F, 75a). Whether this meant taking orders solely from Gamble or merely clearing someone else's order with Gamble was not made clear.

had stood firm against Gamble, allied as Kirby was with the Nationwide Insurance Group, Gamble would have been out on a long limb. Gamble just "never made the grade" (id. at 972). He would have paid $10 per share for 1,500,000 shares of Alleghany with his only prayer for a participation in the control of Alleghany dependent upon the good will of Kirby. Absent the sale to Kirby and faced with his formidable opposition, it is doubtful whether Gamble could have financed the call for the additional maximum of two million shares.[7] The SEC had found:

"That stock interest [the Gamble group's] as such was not of major consequence in the Alleghany power structure in view of the facts that the Murchisons and their associates at all times relevant hereto still retained more stock than had been transferred to the Gamble interests and Kirby owned substantially more . . . We agree with the examiner that the record shows that the Murchisons continued to exercise a dominant role and to retain a substantial pecuniary interest in Alleghany following the execution of the agreements with the Gamble group." (Investment Company Act Release No. 4595, pp. 8–9).

On a careful reconsideration of the record I still come to the same conclusion as did the Commission.

■■ While there is a difference between what the Second Circuit decided in *Phillips* and what this Court has before it, the difference is not large. There the Court of Appeals was sitting in review of the Commission and limited to a determination of whether there was substantial evidence to support its findings. Here the Court is making its own determination, the plaintiff arguing that the original decision was "clearly erroneous." While neither the SEC's determination nor the decision of the Court of Appeals is binding upon this Court, so much of the plaintiff's adversary argument on the facts is identical (as, indeed, the plaintiff himself urges) that the comments on the facts by the Court of Appeals lend support to the views of this Court. If there had been no stipulation and, hence, no record in the SEC before this Court, the decision might well have been that there are such disputed issues of fact as to make a trial necessary. With the stipulation as now read by the plaintiff, the Court is free to determine the preponderance of the credible evidence, for there has been no motion to be relieved of the stipulation.

■ The plaintiff argues, quite plausibly, that the original plan to transfer control of Alleghany to Gamble eventually became part of an even more intricate plan to retransfer the control of Alleghany to Kirby and two co-purchasers. The difficulty with the argument is that the price to be paid to the Murchison group was fixed long before Kirby agreed to buy Gamble's stock and option contract. When Kirby later bought the stock and the option contract from Gamble it was not Murchison fixing a premium for control nor Kirby agreeing to such premium. The price had been fixed earlier as stated above, and there is evidence that it was suggested by Charles Allen, an investment banker, at approximately net asset value.[8]

The plaintiff further emphasizes the testimony of John D. Murchison who swore "We made it clear to him [Burton Gamble] that we were not in a position to make any change in the Board other than the two . . . We also indi-

---

7. If the Gamble Group had exercised the put-call arrangements it would have been able ultimately to vote between 4 million and 4.5 million shares at the 1963 shareholders meeting, about the same number as their opponents, and put the last million shares to the Murchisons after the meeting was over. This was not control, but stalemate—an invitation to a proxy contest.

8. Commenting on this the Commission held: "Under the circumstances we are unable to draw the inference that the $10 price agreed upon included a premium for the transfer of control" (id. p. 10). I am similarly unable to draw that inference by independent review.

cated that any further changes would have to take place in the course of the normal corporate procedure of the stockholder's meeting" (Ex. F to Rountree Affd. p. 19a). The plaintiff offers this to prove that the agreement was that the Board "changeover" would *either* "take place in the course of the normal procedure of the stockholders meeting *or* after the mutual funds are able to have a shareholders meeting for the purpose of approving a shift in control." The latter possibility is pure speculation. So is the possibility that an implied assurance by Murchison that he would vote the shares subject to the call in favor of a Gamble slate at the next shareholders meeting would be kept; or that Murchison could have elected Gamble's slate against the opposition of Kirby and his allies.

Conceding his inability to prove that "everyone was getting off the Board," the plaintiff asserts the reason for such failure of proof is that the scheme was interrupted by the filing of the Phillips application with the SEC on December 17, 1962. Similarly, he argues that the finding that on two major policy matters Gamble's views were rejected ignored the pendency of the SEC proceedings which had made it a "sham battle." That leaves the matter entirely in the realm of speculation and does not amount to proof of Gamble's alleged control.[9]

■ Finally, the plaintiff argues that the Court made no findings that deal specially with *Harrington's* "breach of fiduciary duty" in receiving "a premium for his resignation." The Court reiterates that if Harrington had obtained a premium for the sale of his directorship he would be liable to account to the corporation for the premium. He would have been unjustly enriched. Diamond v. Oreamuno, 24 N.Y.2d 494, 301 N.Y.S. 2d 78, 248 N.E.2d 910 (1969). But the Court found that Harrington sold as part of a group and that the price he received was that negotiated by Murchison, which "price" was not found to include a premium for control but was based on net asset value. It was also found that Harrington resigned because "he had decided to resign as a director earlier;" And "when he sold out he naturally carried out his original inclination and resigned" (Op. pp. 9–10). There is no compelling evidence referred to by the plaintiff that any part of the purchase price to Harrington was *conditioned* upon his resignation. He got substantially what the others in the Murchison group got. He did not commit a breach of fiduciary duty unless he bargained for the sale of his office. The motivation for Murchison's getting a price above the market for Harrington is fairly obvious. Harrington was his comrade in arms in the proxy fight and Murchison would presumably have engaged in a breach of faith if he had not obtained for Harrington as much as he did for himself and his brother. In these circumstances, there is no ground for suggesting that the finding erodes the doctrine of Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928), a doctrine to which one must pay more than lip-service. Although profuse in his argumentation, the plaintiff inevitably comes back to reliance on his assertion that a shareholder in office *must* offer all his fellow-shareholders an opportunity to sell at the price offered him. On his theory, the payment of *any* price above market to such person is not only suspect but condemned on its face as a "breach of fiduciary duty." While it might have been that without the stipulation the suspicion engendered by the plaintiff could have prevented summary judgment for Harrington, the Court has been tendered the evidence as adduced in the SEC proceeding. Assuming that all the testimony and exhibits had been reintroduced before this Court,

9. Plaintiff argues inferences contrary to the finding concerning Gamble's lack of success in formulating the policy of the Board. These are merely arguable inferences which this Court, as well as the SEC, in effect, rejected. (Phillips v. SEC, 388 F.2d at 972).

I must find that the preponderance of the credible evidence is against the plaintiff's contention. That is the result that, in my judgment, would have been reached after trial and that is what I decide now.

For the reasons stated, I adhere to my original decision. This memorandum may, for purposes of appeal, be deemed an order denying a motion under Rule 59 to alter or amend the judgment (Rule 4, Rules of Appellate Procedure).

So ordered.